## In re SMITH, Bankrupt.

### (District Court, D. New Jersey. December 22, 1881.)

1. DISCHARGE.

A bankrupt's application for a discharge is seasonable if made before the discharge of the assignee.

2. SAME—TRANSFERS.

A year before his failure the bankrupt made a transfer of some of his property without consideration. Held, on the evidence, that it was not made in contemplation of bankruptcy

In Bankruptcy.

Coult & Howell, for bankrupt.

Henry Huston, for creditor.

NIXON, D. J. Thirteen specifications are filed against the bankrupt's discharge. On the argument only the third, sixth, seventh, eighth, eleventh, twelfth, and thirteenth were relied upon by the opposing creditor. The third alleges that the bankrupt did not apply for his discharge within a reasonable time. Before the act of July 26, 1876, the law required that the bankrupt, having no assets, should apply for his discharge within one year after the petition in bankruptcy was filed. That act extended the time "to the final disposition of the cause," which has been held to mean the final disposition of the administration of the estate, including the discharge of the assignee. There is no proof before me that the assignee has been discharged. The sixth and seventh allege that the bankrupt allowed fictitious claims to be proved against his estate, severally specifying the proofs of debt made by Abraham Smith, his father, and Jacob Guild, his brother-in-law. The testimony put in by the opposing creditor shows that both of these persons had valid and subsisting claims against the bankrupt. The eighth was that the bankrupt did not keep proper books of account. It was in evidence that he failed in business in the year 1874; that he had books of account while the

business was carried on; that after his failure they were taken by him to his father's house, at Deckertown; that all collectible debts were collected; that he left them there during the year 1876, while he was living in Chicago, and that, without his knowledge or wish, they were sold by his sister to the rag-man, as waste paper, under the impression that they were of no value to any one. All the proof is to the effect that they were regularly kept, and were valueless to the creditors. The remaining specifications have reference to the transfer and assignment by the bankrupt of mineral leases to his brother-in-law, Guild, and of an endowment policy of life insurance for $5,000 upon his life to his father, Abraham Smith. The allegation is that these were transferred by him in contemplation of bankruptcy. I have had no difficulty in regard to the leases, as the evidence is quite clear that they were of no value, either in the hands of the bankrupt or of his assignee. But this is not the case as to the insurance policy. It was taken by the bankrupt on his own life, in the Mutual Life Insurance Company of New York, in 1866, on the plan of its becoming a paid-up policy at the end of 10 years, and all the annual premiums, except one or two, had been paid by the bankrupt at the time of the assignment, and the unpaid premiums were afterwards settled by a transfer of accumulated dividends. It was assigned without the payment of any consideration. The bankrupt says that he gave it to his father because he wanted his parents to have the benefit of it in case of his death. The father testifies that he knew nothing of the transfer for a year or two after it had been assigned to him. Whatever the intention of the bankrupt may have been, the effect of his action was to give over to his father, as against the claims of creditors, a valuable asset. Where the company is solvent, a paid-up policy will generally be purchased by the institution; and where this cannot be effected it has a market value. The counsel for the bankrupt insisted, on the argument, that it could not be said it was assigned "in contemplation of bankruptcy," because the assignor did not go into bankruptcy until five years afterwards. But that is not the meaning of the phrase as used in the law. It occurred in the bankruptcy act of 1841, and had received a judicial construction when the late act was passed.

In *Everett* v. *Stone*, 3 Story, 453, Mr. Justice Story said: " 'Contemplation of bankruptcy' means a contemplation of becoming a broken-up and ruined man; according to the original signification of the term, a person whose table or counter of business is broken up,.

*bancus ruptus.*" In order, therefore, to show that the debtor contemplated bankruptcy, it is not necessary to prove that, at the time of the transfer, there was in his mind an actual intention of becoming a bankrupt. If his pecuniary condition or act committed was such that he could not reasonably avoid becoming a bankrupt, the law considers him as acting in contemplation of bankruptcy. The question, then, is: What was the pecuniary condition of the bankrupt on the eighteenth of April, 1873, when the gift was made to his father? The burden of proof is on the opposing creditor. It is his duty to make it clear that the bankrupt was so much involved that he was in insolvent circumstances, and that bankruptcy was imminent. Has he done so? The bankrupt was two or three times under examination as a witness, and, speaking of the state of his affairs at the time of the assignment of the policy to his father, he says:

"At that time I considered I was good financially; I considered myself worth from six to ten thousand dollars after the payment of all my debts. At that time my property consisted of my store-house, stock in trade, books of account, notes, etc."

Although he gave other testimony on the subject, which excites suspicion and tends to a different conclusion, I am not willing to say that he has positively contradicted it. His failure the next year can be traced to other causes, for he began in the winter of 1873-4 to speculate in mineral lands and stocks, and his operations seemed to have been financially disastrous. In enumerating his debts during the month of April, 1873, he says that he was liable to the Domestic Sewing Machine Company, on account of the transactions of his brother, in $7,000 or $8,000. But he must have been relieved subsequently from the payment of the larger part of this sum, as he elsewhere states that his net loss on account of his brother was not more than from $2,000 to $4,000. In short, the proof does not satisfy me that he was insolvent when the transfer or gift was made, and hence I am relieved from considering whether a gift under such circumstances—so long a time before the bankruptcy proceedings began—is one of the grounds for withholding a discharge under the ninth clause of section 5110 of the bankrupt act.

A discharge will be granted.